**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **CHERILYN KELLOGG (n.k.a. WORSLEY),** | |
| **Plaintiff,** | **MEMORANDUM DECISION AND ORDER** |
| **vs.** | |
| **METROPOLITAN LIFE INSURANCE COMPANY; and PFIZER ACCIDENTAL DEATH AND DISMEMBERMENT INSURANCE PLAN,** | **Case No.  2:06CV610 DAK** |
| **Defendants.** | |

This matter is before the court on (1) Defendants Metropolitan Life Insurance Company and Pfizer Accidental Death and Dismemberment Insurance Plan's ("Defendants") Motion for Judgment on the Record; (2) Defendants' Motion in Limine; and (3) Plaintiff Cherilyn Kellogg's Motion for Partial Summary Judgment.  A hearing on the motions was held on May 22, 2007.  At the hearing, Plaintiff was represented by Brian King, and Defendants were represented by Jack Englert and James Barnett.  Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties.  Since taking the matter under advisement, the court has further considered the law and facts relating to this motion.  Now being fully advised, the court renders the following Memorandum Decision and Order.

# I.  BACKGROUND

Cherilyn Kellogg ("Ms. Kellogg") is the widow and designated beneficiary of Brad Kellogg ("Mr. Kellogg"), who was killed in an auto accident in Merced, California on September 6, 2004.   Mr. Kellogg was an employee of Pfizer, Inc. ("Pfizer"), and he elected certain benefits through his employment.   Those benefits included life insurance and Accidental Death and Dismemberment ("AD&D") insurance.   The life insurance and AD&D insurance were provided through defendant Metropolitan Life Insurance Company, Inc., ("MetLife").   Pfizer is the plan sponsor and the plan administrator of the Pfizer Accidental Death and Dismemberment Insurance Plan.   MetLife is the Claim Administrator of the Plan and also fully insures the benefits payable under the Plan.   The Plan grants authority to MetLife in its capacity as the Claim Administrator to "make, in its sole discretion, all determinations arising in the administration, construction, or interpretation of these Plans, including the right to construe disputed or doubtful Plan terms and provisions, and any such determination shall be conclusive and binding on all persons, to the maximum extent permitted by law."

MetLife paid Ms. Kellogg benefits under the life insurance policy, but denied benefits under the AD&D insurance.   In this lawsuit, Ms. Kellogg argues that MetLife's denial of her AD&D claim should be reversed because it was without reasonable basis and because MetLife failed to satisfy ERISA's claims procedure requirements.

## A.  Events of September 4, 2004

On the afternoon of September 6, 2004, Mr. Kellogg was driving his minivan in Merced, California.   As he drove away from a stop sign, he swerved across the west-bound lane and

collided with a tree on the side of the road.  He died as a result of injuries suffered in the collision

of his van with the tree.  At the time of the collision, the weather was clear and dry, and there

were no unusual road or traffic conditions.  No other vehicle or pedestrian was involved in the

circumstances leading to this collision.   He made no effort to avoid hitting the tree, nor did he

slow down as he approached the tree.   An eyewitness reported to the police that Mr. Kellogg

appeared to be having a seizure as he drove off the road into the tree.  Based on the lack of other

possible contributing factors and the eyewitness statement of Ms. Risener, the investigating

officer stated that "it appears that [Mr. Kellogg] may have possibly had a seizure, causing him to

wreck the vehicle."  The post-mortem toxicology report revealed that Mr. Kellogg had a level of

a medication, Bupropion, in his system that exceeded the effective level of that medication by

more than twenty times.  Even at an effective level, one of the recognized side effects of

Bupropion is seizures.

   The final autopsy report found that the cause of death was "extensive subarachinoid

hemorrhage of the brain secondary to traumatic transverse basilar skull fracture."  Based on the

toxicology report, the Deputy Coroner stated that:

> [Mr. Kellogg had] effective levels of acetaminophen, hydrocodone,
> propoxyphene, and Norpropoxyphene. Levels of Bupropion far exceed therapeutic
> levels in this patient.  Idiosyncratic reactions of this drug include: numerous
> neuropsychiatric phenomenon including psychoses, confusion, delusions,
> hallucinations, psychotic episodes and paranoia. Whether excessive levels of this
> drug contributed to this subject's accidental and [sic] death is unknown.

   By a letter dated February 9, 2005, Ms. Kellogg's California counsel, Jan T. Perkins,

transmitted the completed claim statement to Pfizer.   MetLife received the claim form from

Pfizer on February 21, 2005.   Ms. Kellogg sought the Basic Life Insurance Benefit, the Optional

Employee Life Insurance Benefit, and the AD&D benefit.   Ms. Perkins enclosed a copy of a

preliminary Death Certificate that did not indicate the cause of death.   Ms. Perkins noted that the

final Death Certificate had not yet been issued due to a backlog in processing death certificates in

California.  She raised the possibility of "process[ing] and pay[ing] the base benefits now and

deal[ing] with the claim under the AD&D later when the final death certificate is issued by the

State of California."

By a letter dated March 8, 2005 to Ms. Perkins, MetLife stated that it needed to

receive an "Amended Certified Death Certificate indicating the manner of death" due to

the original Death Certificate being subject to a "pending investigation."  MetLife also stated that

it could not consider the AD&D benefit claim until it had received copies of the police report, the

autopsy report, the toxicology report, and any newspaper articles concerning the Mr. Kellogg's

death.

By a letter dated March 25, 2005, MetLife contacted the Merced County Coroner.

MetLife noted its understanding that the original Death Certificate regarding Mr. Kellogg was

"pending investigation."  MetLife asked the Coroner to provide a "written statement by the

medical examiner/coroner on their letterhead stating the manner of death."

On April 1, 2005, the Merced County Sheriff's Department transmitted a letter dated

March 30, 2005 to MetLife regarding Mr. Kellogg's death.  The Deputy Coroner stated that Mr.

Kellogg's death was "not the result of a homicide or a suicide."  He noted that Mr. Kellogg

"died as a result of traumatic injuries sustained in a solo motor vehicle accident."  The Deputy

4

Coroner also indicated that "[i]t will be months before [the amendment to the Death Certificate] will be made available for dispensation by the local Health Department."

On May 5, 2005, Ms. Perkins requested the immediate payment of all but the AD&D benefit. She recognized that "[c]ertainly not all of these problems [relating to the delay in the payment of Ms. Kellogg's claims] have been caused by either Pfizer or MetLife." Nevertheless, Ms. Perkins noted her understanding that MetLife "would pay the basic death benefit upon receipt of a letter from the Merced County Coroner," and that Ms. Kellogg "would reserve [her] claim for the accidental death and dismemberment benefit until a final death certificate is issued by the State of California." Ms. Perkins indicated that there apparently had been a delay in Pfizer conveying the final amount of the benefits to MetLife. She reiterated her demand for the payment of the life insurance benefits, and stated that "[w]e will deal with our claim for accidental death and dismemberment proceeds, if any, later."

A series of communications over May 5-9, 2005 confirmed that Mr. Kellogg was eligible for the increase in life insurance coverage relating to the Optional Employee Life Insurance Benefit. MetLife approved the payment to Kellogg of the Basic Life Insurance Benefit, the Optional Employee Life Insurance Benefit, and accrued interest on those benefits in the total amount of $443,184.00. On May 11, 2005, MetLife transmitted the payment of those benefits to Ms. Kellogg by Federal Express overnight delivery.

By a letter dated May 10, 2005, MetLife informed Ms. Kellogg's lawyer that it had not yet received the documents necessary to consider the claim for the AD&D benefit. MetLife reiterated its need to receive copies of the police report, the autopsy report, the toxicology report,

and any newspaper clippings relating to the death of the Decedent.   By a letter dated June 9,

2005, Ms. Perkins transmitted to MetLife copies of the final Death Certificate, the police report,

the autopsy report, and a newspaper article.  Based on those materials, Ms. Perkins demanded

that MetLife approve the payment of Kellogg's AD&D benefit claim.

In the Amended Death Certificate, the Deputy Coroner described the circumstances

surrounding Mr. Kellogg's death as:

> The Decedent was the safety belt restrained driver and sole
> occupant of a Dodge Caravan that he was driving eastbound on
> Alexander Avenue. The Decedent completed a stop at the posted
> stop sign at the intersection of Parsons Avenue.  He then again
> proceeded eastbound and at that point, according to a witness, he
> appeared to have a seizure, lost control of the vehicle, and ran head
> on into a tree located next to the curb of the westbound lane of
> Alexander. The Decedent had a post-mortem blood Bupropion
> level of 2.29 mg/l. This drug has a reported risk factor of seizures.

On June 22, 2005, MetLife obtained information about the medications that the

toxicology report had found in Mr. Kellogg's blood.  By a letter dated June 29, 2005, MetLife

informed Ms. Perkins that its review of Kellogg's AD&D benefit claim was underway.

As Ms. Kellogg claims, the administrative record shows that MetLife performed only

internet searches regarding the various drugs found in Mr. Kellogg's blood.  Met Life did not

initiate any further contact with the coroner, it did not contact or interview the police personnel

who responded to Mr. Kellogg's accident, it did not contact or interview the paramedic or other

emergency personnel who responded to the accident, it did not obtain any medical records ro

reports from the emergency personnel who responded to the accident, it did not contact the lay

witness who allegedly saw Mr. Kellogg having a seizure, and it did not obtain any of Mr.

Kellogg's medical records or attempt to obtain his medical history.  There is also no indication

that Met Life utilized anyone with professional medical qualifications or credentials to review the

AD&D claims.    According to MetLife, it was not required to undertake such an investigation

when the evidence supported the conclusion that Mr. Kellogg had a seizure.

By letters dated July 6, 2005 and October 26, 2005, Ms. Perkins requested that MetLife

render its decision regarding Ms. Kellogg's AD&D benefit claim.  On November 7, 11, and 15,

2005, a MetLife representative spoke with Ms. Perkins by telephone about the status of the claim

review.

By a letter dated November 17, 2005, MetLife denied Ms. Kellogg's claim for an AD&D

benefit.   MetLife noted that an AD&D benefit was payable only "if a plan participant dies as a

result of an accident."  MetLife also stated that the Plan did not provide AD&D coverage for

"'losses due to: … physical … illness.'"  MetLife cited the evidence of the police report that:

> according to a witness to the crash, after taking off from a stop sign, the decedent's
> vehicle veered into a tree. The witness stated that it appeared the decedent was having a
> seizure. She saw no attempt by the decedent to brake or avoid the tree.  The police could
> find no other cause for the  crash.

Therefore, MetLife concluded that the decedent's death was not the result of an accident, but

instead was due to the Decedent's "physical illness, the seizure."

By a letter dated January 13, 2006 to MetLife, Brian S. King, Ms. Kellogg's Utah

counsel, informed MetLife of his representation of Ms. Kellogg.   Mr. King stated that he was

"appealing the decision to deny payment of [AD&D] benefits to Ms. Kellogg."  Mr. King noted

that it appeared that Met Life had relied on a police report containing a witness statement about

7

the seizure, and Mr. King stated that "Mr. Kellogg had no history of seizure activity and there is

no reason, other than the witness's statement, to believe that a seizure was the cause of the

accident."   Mr. King also stated that "beyond making this statement, we are not in a position to

intelligently appeal MetLife's denial."   He therefore requested the information that MetLife

relied on in coming to its conclusion, including the entire claim file, the complete AD&D policy,

a copy of the AD&D Certificate of Coverage, Summary Plan Description, plan documents and

any other documents under which the ERISA plan was established or operated.  He also

requested information concerning whether MetLife had relied on any reviews from individuals

with medical training or other non-medical expertise as part of its investigation.   Mr. King also

indicated that he "needed additional time in which to submit a complete appeal package," and

thus requested that he be allowed "sixty days following receipt of these documents and

information to evaluate them and present additional information to MetLife regarding Ms.

Kellogg's claim."  Met Life did not respond to this letter.

        By a letter dated May 2, 2006 to MetLife, James L. Harris, another of Ms. Kellogg's

Utah counsel, renewed the request for copies of the claim file and the Plan documents.  Mr.

Harris also again requested that they "have sixty (60) days following the receipt of these

documents and information to evaluate them and present additional information to MetLife

regarding Ms. Kellogg's claim."

        On May 2, 2006, Mr. King contacted Pfizer, Inc. by telephone to inquire about the proper

person to whom he should direct copies of his correspondence to MetLife requesting copies of

documents relating to Ms. Kellogg's claim.  A Pfizer representative told Mr. King to forward the

documents to her, and stated that she "would forward the request to the correct department."

On May 2, 2006, Mr. King's office transmitted copies of Mr. Harris' letter of May 2, 2006 and its enclosures to Pfizer, Inc.  By a letter dated May 10, 2006, Pfizer transmitted copies of the Summary Plan Description and the Certificate of Insurance of the Plan to Mr. Harris in response to his request of May 2, 2006.  MetLife never responded to the various letters.

## II.  DISCUSSION

### A. Standard of Review

The United States Supreme Court has held that a district court reviews a denial of benefits "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).   Here, the Plan expressly provides that MetLife, in its capacity as the Claim Administrator, "shall make, in its sole discretion, all determinations arising in the administration, construction, or interpretation of these Plans, including the right to construe disputed or doubtful Plan terms and provisions, and any such determination shall be conclusive and binding on all persons, to the maximum extent permitted by law.

Where an employee benefit plan grants the administrator discretion, the court is to overturn a benefit denial only if the decision was arbitrary and capricious.  *Dycus v. Pension Benefit Guar. Corp.*, 133 F.3d 1367, 1369 (10th Cir. 1998);  *Nance v. Sun Life Assur.  Co. of Can.*, 294 F.3d 1263, 1266 (10th Cir. 2002).   When a Claim Administrator does not have a conflict of interest, a district court must apply the fully deferential form of the arbitrary and

9

capricious standard of review. *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1097-98 (10th Cir. 1999).

Under this level of review, the Tenth Circuit has held that the administrator's "decision need not be the only logical one nor even the best one.   It need only be sufficiently supported by the facts within [his] knowledge to counter a claim that it was arbitrary and capricious." *Id. at* 1098 (internal quotations omitted).  A district court will uphold a claims administrator's decision "unless it is 'not grounded on *any* reasonable basis.'" *Id.* (emphasis in original);  *see also Charter Canyon Treatment Ctr. v. Pool Co.*, 153 F.3d 1208, 1213 (10th Cir. 1998).   When a court reviews a claim decision under the arbitrary and capricious standard of review, the court '"need only assure that the administrator's decision fall[s] somewhere on the continuum of reasonableness – even if on the low end.'" *Id.* (quoting *Vega v. National Life Ins. Serv., Inc.,* 188 F.3d 287, 297 (5th Cir. 1999)); *Sandoval v. Aetna Life & Cas. Ins. Co.,* 967 F.2d 377, 381 (10th Cir. 1992) ( the "responsibility lay[s] in determining whether the administrator's actions were arbitrary and capricious, not in determining whether [the claimant] was, in the district court's view, entitled to disability benefits."   A denial is arbitrary and capricious only "if it is not a reasonable interpretation of the plan's terms," *McGraw v. Prudential Life Ins. Co. of Am.*, 137 F.3d 1253, 1259 (10th Cir. 1998), or if it is based on a "lack of substantial evidence, mistake of law, bad faith, or conflict of interest." *Counts v. Kissack Water & Oil Serv., Inc. Profit Sharing Plan*, 986 F.2d 1322, 1324 (10th Cir. 1993).

Ms. Kellogg argues, however, that the court should review MetLife's decision on a *de novo* standard of review.   She contends that she is entitled to a *de novo* review because (1)

10

MetLife has an inherent conflict of interest because MetLife is the payor of claims and the plan fiduciary/plan administrator, and (2) the procedural irregularity that occurred when MetLife precluded her from appealing the decision.

In *Fought v. UNUM Life Ins. Co. of America*, 379 F.3d 997 (10th Cir. 2004), the Tenth Circuit established a framework for determining the effect of a conflict of interest on the district court's review under the arbitrary and capricious standard of review. In cases of an inherent conflict of interest, the burden of proof shifts and "the plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is supported by substantial evidence." *Id.* at 1006. "The district court must take a hard look at the evidence and arguments presented to the plan administrator to ensure that the decision was a reasoned application of the terms of the plan to the particular case, untainted by the conflict of interest." *Id.*; *see also Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1190 (10th Cir. 2007)

In the instant case, Ms. Kellogg has failed to establish that this dual capacity actually jeopardized MetLife's impartiality. *See Adamson v. UNUM Life Ins. Co. of Am.*, 455 F.3d 1209, 1213 (10th Cir. 2006) (finding the fact that an insurer administers and insures a plan "does not on its own warrant a further reduction in deference.") Nevertheless, out of an abundance of caution and due to the confusion surrounding Ms. Kellogg's attempted appeal, the court has adjusted the standard of review, finding that "the plan administrator must demonstrate that its interpretation of the terms of the plan is reasonable and that its application of those terms to the claimant is

supported by substantial evidence."[1] *Fought*, 379 F.3d at 1006.

Plaintiff also contends that she did not receive a full and fair review of her claim, and thus, the court should not only accord less deference to MetLife's decision, but that the court should also consider evidence that was not in front of Met Life when it made its decision to deny benefits.

There is no doubt that MetLife did not timely respond to the letters from Ms. Kellogg's attorneys. In those two letters, dated January 13, 2006 and May 2, 2006, her attorneys indicated that Ms. Kellogg was appealing the denial of benefits. They requested copies of the plan documents and the specific reasons for the denial of benefits, and they requested 60 days after the receipt of the requested documents to file their appeal. MetLife did not send any documents or respond to Ms. Kellogg's attorney that there were no other documents pertaining to the reasons for the denial. On July 26, 2006, after failing to obtain a response from MetLife, Ms. Kellogg filed this lawsuit.

While the court recognizes that Tenth Circuit law is clear that no additional documents may be considered during this type of review, the instant case calls for an exception to be made. Had MetLife responded to the letters from Ms. Kellogg's counsel, Plaintiff presumably would have submitted these documents to MetLife, and the documents would be contained in the

---

[1] Given the court's conclusion below that MetLife has satisfied this burden, the court notes that the application of a pure "arbitrary and capricious" standard of review would further bolster its conclusion. Even under a pure *de novo* standard of review, however, the court would affirm MetLife's determination.

administrative record.  Thus, in this unique circumstance, the court will consider the documents

here.[2]  Accordingly, the court has confined its review to the facts that were before MetLife at the

time of its claim determination, along with the additional forty-eight  pages of medical records

submitted by Plaintiff.

**B. Analysis**

### 1.     *The Plan Language*

Because ERISA governs the Plan, the court must interpret the Plan under federal common

law.  *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987); *Pirkheim v. First Unum Life Ins*.,

229 F.3d 1008, 1010 n.3 (10th Cir. 2000).   Courts begin their analysis by applying principles of

contract interpretation to the language of the ERISA plan document.  *Chiles v. Ceridean Corp.*,

95 F.3d 1505, 1515 (10th Cir. 1996).   Courts "examine the plan documents as a whole and, if

unambiguous . . . construe them as a matter of law."  *Id.* at 1511.  Courts will give words their

common and ordinary meaning.  *Id.* A court's objective in construing an ERISA plan document

is to ascertain and to carry out the true intentions of the parties based on the manner in which a

reasonable person in the position of a general participant, not the litigating participant, would

---

[2]  These medical records contain only two additional facts–one of which is already in the
record.   First, the medical records show that Mr. Kellogg had no history of seizures–a fact
already asserted in Mr. King's January 13, 2006 letter to MetLife.   Second, the medical records
show that Mr. Kellogg was not a smoker.  Apparently, this information has been submitted in
response to information contained in MetLife's file regarding the information found on the
internet (specifically on www.webmd.com) regarding Bupropion.  The information printed out
from this internet site indicates that Bupropion can be used for smoking cessation.  Plaintiff
ignores the fact that the internet information in the record also indicates that the *primary* usage of
Bupropion is to treat depression.   Kellogg Rec. 012.

have understood the plan's terms.   *McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192,

1202 (10th Cir. 1992).

> ### 2.     *Substantial Evidence Supports MetLife's Determination That Mr. Kellogg's Death Was Not Accidental*

The SPD of the Plan provides that an AD&D benefit is available only if a participant

die[s] as a result of an accident."   The Certificate of Insurance of the Plan states that a covered

AD&D benefit must arise from "an accidental injury that is the Direct and Sole Cause of a

Covered Loss …."   The Certificate defines "Direct and Sole Cause" as "a direct result of the

accidental injury, independent of other causes."   *Id.*

The evidence of the administrative record supports MetLife's determination that Mr.

Kellogg's death was not the direct result of an accident "independent of other causes."   On a dry,

sunny afternoon, Mr. Kellogg swerved across a lane of traffic and collided with a tree.   There

were no weather, road, or traffic conditions that contributed to or explained this collision.   The

eyewitness testimony of Ms. Risener, however, provided the explanation.   Ms. Risener reported

to the Police that Mr. Kellogg "appeared to be having a seizure" when he drove into the tree.

She also observed that he did not step on his brakes or try to avoid colliding with the tree.

Under both the common understanding of an accident independent of other causes and the

terms of the Plan, MetLife reasonably determined that Mr. Kellogg did not die as a result of an

accident.   *See, e.g., Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008, 1010-11 (10th Cir.

2000)(ERISA plan administrator properly denied AD&D claim relating to death that "did not

occur independent of all other causes").  There is substantial evidence supporting MetLife's

conclusion that Mr. Kellogg's  death arose out of the seizure causing him to drive into the tree,

and, therefore, was not independent of all other causes.  Therefore, MetLife has met its burden in

establishing the reasonableness of its conclusion that Mr. Kellogg's unfortunate death falls

outside the scope of the AD&D coverage of the Plan.[3]

> **3.**     ***Substantial Evidence Supports MetLife's Determination That the Plan
> Excludes AD&D Coverage for Death Due to Physicaln Illness***

    In addition, the Plan expressly excludes from AD&D coverage a death that is due to

"physical or mental illness."   In this case, the evidence supports MetLife's determination that a

physical illness in the form of a seizure caused Mr. Kellogg to drive into the tree.   There was no

evidence of anything contributing to the fatal collision other than the seizure that Ms. Risener

had observed.   Furthermore, the post-mortem toxicology report provided an explanation for the

seizure, because Mr. Kellogg had a level of Bupropion in his blood  more than twenty times

greater than that drug's therapeutic levels.  The Deputy Coroner also noted that a risk of

Bupropion ingestion is seizures.   The court cannot conclude that MetLife has not met its burden

of establishing that substantial evidence supports its determination that Mr. Kellogg's death falls

---

[3]  Ms. Kellogg relies on the Deputy Coroner's characterization of the death as
"accidental."  Kellogg Rec. 57-58.   However, the Deputy Coroner was neither aware of the
terms of the Plan nor charged with the interpretation of the Plan.  The Deputy Coroner's use of
the term "accident" was simply a function of the only categories of death available to him (*i.e.,*
homicide, suicide, or accident), and had absolutely no relevance to the issues of this case. *See,
e.g., Mullaney v. Aetna U.S. Healthcare*, 103 F. Supp. 2d 486, 491 (D.R.I. 2000)("However,
the medical examiners [sic] determination of 'accident' does not mean that Mr. Mullaney's
'accident' was the sort contemplated by defendant or described in the Plan.").

within the Plan's exclusion for death due to physical illness and is not covered under the Plan's AD&D benefit.

While Ms. Kellogg has provided evidence that Mr. Kellogg had no history of seizures and was not a smoker, this evidence does not compel a different conclusion.  MetLife has satisfied its burden of proof, demonstrating that its interpretation of the terms of the Plan is reasonable and that its application of those terms to the events surrounding Mr. Kellogg's untimely death is supported by substantial evidence.

### III.  CONCLUSION

For the foregoing reasons and good cause appearing, IT IS HEREBY ORDERED that:

(1) Defendants Metropolitan Life Insurance Company and Pfizer Accidental Death and Dismemberment Insurance Plan's ("Defendants") Motion for Judgment on the Record [docket # 24] is GRANTED; (2) Defendants' Motion in Limine [docket # 22] is DENIED; and (3) Plaintiff Cherilyn Kellogg's Motion for Partial Summary Judgment [docket # 26] is DENIED.  The clerk of court is directed to enter judgment in favor of Defendants.  Each party is to bear their/her own costs.  This case is now closed.

DATED this 7th day of September, 2007.

BY THE COURT:

_Dale A. Kimball_

DALE A. KIMBALL
United States District Judge